158

In the Matter of the Arbitration between NEW YORK CITY TRANSIT AUTHORITY, Appellant, and LOUIS THOM et al., Respondents.

Second Department, August 20, 1979

### APPEARANCES OF COUNSEL

*Alphonse E. D'Ambrose (Helene E. Blank* and *John A. Murray* of counsel), for appellant.

*George M. Schlossman (Morton Miller* of counsel), for respondents.

### OPINION OF THE COURT

SHAPIRO, J.

The issue in this case, not yet passed on by an appellate court, is whether the New York City Transit Authority (the authority) must provide "uninsured motorists coverage" for its passengers, and others, injured as a result of the operation of its vehicles. We hold that such coverage is required and therefore affirm Special Term's denial of the authority's application to restrain the arbitration sought by respondents.

#### FACTS

On May 19, 1977 the respondents were passengers on a bus owned by the City of New York which was leased to and operated by the authority. The respondents claim they were injured when the bus collided with an unidentified motor vehicle. The bus was allegedly stopped at an intersection waiting for the traffic light to turn green. The unidentified automobile coming from the opposite direction allegedly proceeded through the intersection against the red light, crossed over the yellow dividing line and struck the authority's bus on the left front side. It then left the scene of the accident. Respondents timely filed the required notices of claim and submitted to examinations by the appellant.

Based on their contention that the authority was required to provide uninsured motorists coverage, the respondents served a demand for arbitration upon the authority. The authority moved for an order permanently restraining arbitration alleging that it was not required to provide such coverage. Special Term denied its application. The judgment entered on its denial, and the subsequent order denying renewal, should be affirmed.

### THE LAW

The relevant provisions of former section 17 of the Vehicle and Traffic Law (L 1932, ch 340) required indemnity bonds or insurance policies to be obtained by "[e]very person, firm, association or corporation engaged in the business of carrying or transporting passengers for hire in any motor vehicle, except * * * *motor vehicles owned and operated by a municipality*" (emphasis supplied). Such bonds or insurance policies were to provide stated minimum liability coverage for damages "for death or for injury to persons or property" (L 1932, ch 340). At that time New York State law did not require that liability insurance (or indemnity bonds as an alternative) be carried by other motor vehicles.

That section, as amended and expanded, evolved into section 370 of the Vehicle and Traffic Law as it was revised effective October 1, 1960 (L 1959, ch 775). The quoted provision of former section 17 remained intact and is the lead sentence of subdivision 1 of section 370. The latter section is entitled "Indemnity bonds or insurance policies; notice of accident" and it is part of article 8 of the Vehicle and Traffic Law which bears the title "Indemnity Bonds or Insurance Policies on Vehicles Transporting Passengers for Hire".

In 1962 subdivision 3 of section 370 was amended (L 1962, ch 888; see, also, L 1962, ch 609) to authorize *self-insurance* (in lieu of insurance or indemnity bond) by "a person, firm, association or corporation engaged in the business of renting or leasing motor vehicles, having registered in this state more than twenty-five motor vehicles". The authorization was subject to the approval of the Commissioner of Motor Vehicles if he was reasonably satisfied that the applicant was possessed of financial ability to respond to a judgment against it.[1] Never-

---

1. The legislative bill jacket includes an approving letter to the Governor by counsel to the Department of Motor Vehicles, which explains the bill's purpose as follows:

"Before the enactment of the compulsory insurance law for all motor vehicles, the only vehicles which as a class were required to have insurance coverage were taxicabs and buses. Because rental vehicles used for carrying passengers were operated by persons other than the owner, it was determined that these vehicles also should be required to have the statutory insurance and for this reason subdivision 4 was added to the section requiring statutory insurance. Now that there is compulsory insurance for all motor vehicles, it seems unnecessary to continue to make a distinction between the rental vehicles and those which are ordinarily registered as the principal user thereof. In addition, many of the same rental companies which rent passenger cars also engage in the trust rental business and at the present time they are permitted to self insure on the trucks but not on the passenger cars. There seems to be no reason for this distinction."

theless article 8 continued to be entitled "Indemnity Bonds or Insurance Policies on Vehicles Transporting Passengers for Hire", and section 370 thereof continued to be entitled "Indemnity bonds or insurance policies". Therefore, as of October 1, 1962, both titles were misleading, since they did not indicate that there was another "or" (contained in subdivision 3) to wit, self-insurance as to an owner of more than 25 passenger vehicles who rented or leased them to the general public.

In 1971 section 370 was further amended (L 1971, ch 794) by adding the following provision to paragraph (b) of subdivision 1: "Notwithstanding any contrary provisions of this chapter, any such bond, or policy of insurance shall also provide for uninsured motorists coverage"; but no reference was made to the self-insurance provision contained in the 1962-enacted subdivision 3.

It is the respondents' position that since the authority is a "person, firm, association or corporation engaged in the business of carrying or transporting passengers for hire", and since its bus was not a motor vehicle "owned and *operated* by a municipality", the authority is required to provide the uninsured motorists coverage mandated by the 1971-enacted paragraph (b) of subdivision 1 of section 370.

The authority, on the other hand, argues that pursuant to various provisions of the Vehicle and Traffic Law and section 1215 of the Public Authorities Law, it is deemed a political subdivision of the State and is thereby exempt from the mandate for uninsured motorists coverage contained in the 1971 amendment of section 370, just as it would be if it were a municipality.

The authority further argues that the mandate of section

"Since the Department of Motor Vehicles already has set up within the Department a self-insurance section which passes upon applications for self insurance under the compulsory insurance law, it is able to handle with no additional problems the requests for self insurance which would originate as a result of this measure. This measure does not affect taxicabs or buses, which still would be required to have insurance or a bond as a prerequisite to registration, and it affects only the larger rental companies which have registered more than twenty-five passenger motor vehicles. *It would not, by permitting self-insurance rather than requiring insurance, result in any diminution of the protection now afforded to the users of these vehicles or other persons"* (emphasis supplied).

If, as appellant contends, self-insurers are not required to provide uninsured motorists coverage, it *would* result in "diminution of the protection * * * afforded to * * * other persons", since owners of motor vehicles are now generally required to furnish such coverage.

370 (subd 1, par [b]) of the Vehicle and Traffic Law pertains only to owners and operators of such vehicles who have chosen to secure indemnity bonds or insurance policies as their method of providing financial security to injured persons or damaged property arising out of the operation of their vehicles, and that since the authority has chosen to be an unregulated self-insurer (pursuant to hereafter-stated exemptions from the Motor Vehicle Financial Security and Safety Responsibility Acts [Vehicle and Traffic Law, arts 6, 7]) it is not required to provide uninsured motorists coverage. Its contention, if upheld, would mean that *all* self-insurers, regulated (per § 370, subd 3) or unregulated (because of statutory exclusion as hereinafter set forth) would not be required to provide uninsured motorists coverage.

We reject the authority's arguments and we discuss them *seriatim.*

### THE CONTENTION THAT THE AUTHORITY IS A POLITICAL SUBDIVISION OF THE STATE AND IS THEREFORE NOT REQUIRED TO PROVIDE UNINSURED MOTORIST COVERAGE

Although section 370 of the Vehicle and Traffic Law, consonant with its predecessor former section 17, excludes from the requirement of insurance or indemnity bonds only "motor vehicles * * * owned and operated by a municipality" which are used in the business of carrying passengers, the authority claims that it also excludes any political subdivision of the State and that the authority is such a political subdivision.

The authority makes no claim that it falls within the stated exclusion in section 370 of a *municipality* which owns and operates such motor vehicles, nor could it reasonably so contend since it does not *own* the buses which it operates. Furthermore, the term "municipality" is synonymous with the term "municipal corporation", which is statutorily defined as "includ[ing] only a county, town, city and village" (General Municipal Law, § 2; see, also, General Municipal Law, §§ 119-n, 800, subd 4; Local Finance Law, § 2.00, subd 1; ECL 15-0107, subd 3). Thus, the soundness of the authority's contention requires acceptance of at least two propositions—first, that the authority is a political subdivision of the State and second, that such political subdivisions are excluded from the requirement of furnishing uninsured motorists coverage.

Analysis of those contentions requires consideration of vari-

ous statutes, starting with section 1215 of the Public Authorities Law. That statute is contained in title 9 of article 5 (§§ 1200-1221), which specifically relates to, and is entitled, the "New York City Transit Authority".

The present title 9 of article 5 of the Public Authorities Law was originally titled 15 and the present section 1215 was originally section 1815. Title 15 was enacted effective March 25, 1953 (L 1953, ch 200). It transferred the public transportation functions of the City of New York to a separate public authority, the New York City Transit Authority. In Governor Dewey's "special message to the Legislature", in which he recommended the legislation, he quoted with approval the reasons therefor as stated by the Board of Estimate of the City of New York (McKinney's Session Laws of NY, 1953, p 2088):

" '1. It will remove the transit deficit from the City's expense budget and thereby avoid transit competing with schools, hospitals and other vital services for operating funds.

" '2. It will eventually release transit construction funds for extensions and improvements from the City's debt incurring power and consequently, enable greater use of such funds for building schools, hospitals and other essential public improvements.

" '3. Its independent and organizational set-up should lend itself to a more efficient operation, thereby reducing its costs and revenue needs.' "

Section 1815 (now § 1215) of the Public Authorities Law read:

"Construction of terms

"Whenever the term public service commission, or board of rapid transit railroad commissioners, or transit construction commissioner, or transit commission or board of transportation, occurs in any law, contract or document relating to facilities conveyed to the authority or their operation or any other duty imposed upon the authority pursuant to this title, or when in any law, contract or document reference is made to such commission, board, commissioner, or board of transportation in connection with such facilities, operations or duties whereof was so conveyed, such term or reference shall be deemed to refer to and include the authority, to the extent consistent with the provisions of such law, contract or document."

The obvious purpose of that section was merely to continue

the applicability of any statute, contract or document relating to its predecessor's activities.

Three months later, on June 26, 1953, section 1815 was amended (L 1953, ch 881) by the addition of the following sentence: "For the purposes of subdivision four of section fifty of the workmen's [now workers'] compensation law, the term other political subdivision of the state shall be deemed to refer to and include the authority." The reference to the Workmen's Compensation Law (§ 50, subd 4, par a) was to the provision therein that "[a] county, city, village, town, school district, fire district or other political subdivision of the state" had stated options of providing compensation to their injured employees by methods less restrictive as to self-insurance and proof of financial ability than those applicable to private employers.

It is quite understandable that the Legislature, by its June 26, 1953 amendment to section 1815 of the Public Authorities Law, desired to continue the same arrangement that the City of New York theretofore had as to self-insurance, etc., relating to compensation benefits for its transit employees. It had apparently not been originally realized that the transfer of the city's public transportation functions to the authority raised questions as to whether the pre-existent security arrangements for compensation benefits (pursuant to the options contained in Workmen's Compensation Law, § 50, subd 4, which applied, *inter alia,* to a "city") would continue when the New York City Transit Authority became the successor employer. It should be noted that subdivision 4 of section 50 does not include within its mentioned entities a "public authority". The Legislature could have carried out its intent that section 50 should apply to the authority by either amending that statute to include the New York City Transit Authority within the entities having the stated options as to security for compensation benefits or by amending section 1815 (now § 1215) of the Public Authorities Law by providing that the term "other political subdivision of the state" (which *was* one of the entities mentioned in Workmen's Compensation Law, § 50, subd 4) was to be deemed to include the New York City Transit Authority for the purposes of that provision of the Workmen's Compensation Law. The Legislature chose to adopt the latter method, most likely because section 1815 was entitled "Construction of terms" and the amendment could be

deemed "construction" of the term "other political subdivision of the state" for the stated limited purpose only.

In a similar manner, and for essentially similar reasons, section 1215 of the Public Authorities Law was amended in 1957 (L 1957, ch 556). That amendment added the following final sentence to section 1215: "For the purposes of sections ninety-three-k [now § 321] and ninety-four-ff [now § 360] of the vehicle and traffic law, the term any political subdivision shall be deemed to refer to and include the authority."

Section 321 is contained in article 6 of the Vehicle and Traffic Law (the Financial Security Act) and section 360 is contained in article 7 (the Safety Responsibility Act). Article 6, in general, relates to compulsory insurance or self-insurance with regard to motor vehicles registered in the State. Article 7, in general relates to suspension and revocation of licenses and registrations upon failure to satisfy a judgment for damages caused by a motor vehicle accident.

Section 321, entitled "Exceptions", states in relevant part that article 6 (the Financial Security Act) "shall not apply * * * to any motor vehicle owned by the United States, any state or *any political subdivisions of any state"* (emphasis supplied).

Similarly, section 360, also entitled "Exceptions", states that article 7 (the Safety Responsibility Act) "shall not apply * * * to any motor vehicle owned by the United States, *the state or any political subdivision thereof"* (emphasis supplied).

The 1957 amendment to section 1215 of the Public Authorities Law, by stating that "for the purposes of" those two sections of the Vehicle and Traffic Law the term "any political subdivision shall be deemed to refer to and include the authority" simply meant that the New York City Transit Authority (1) was not to be required to provide liability insurance or an indemnity bond, as was required of motor vehicles in general (and that its self-insurance was to be unregulated [as compared to the regulated self-insurance provided in subdivision 3 of section 370 of the Vehicle and Traffic Law relating to entities which rent or lease more than 25 motor vehicles]) and (2) was not to be subject to having its registrations and licenses revoked for failure to pay judgments following an accident.

The legislative bill jacket to this 1957 amendment of the Public Authorities Law contains an illuminating letter to the

Governor from the counsel to then Comptroller Arthur Levitt, dated April 5, 1977. In relevant part it states:

"This bill amends section 1815 [now 1215] of the Public Authorities Law to exempt the New York City Transit Authority from certain provisions of the Motor Vehicle Financial Responsibility Act (see § 93-k) [now § 321], and the Motor Vehicle Safety Responsibility Act (see § 94-ff) [now § 360] of the Vehicle and Traffic Law, as to motor vehicles operated by it.

"We are advised by the New York City Transit Authority that it operates a number of buses, trucks and automobiles which are the property of the City of New York and are part of the transit facilities, leased by the City to the Authority.

"Under the provisions of sections 93-k and 94-ff of the Vehicle and Traffic Law, motor vehicles owned by the State or any political subdivision of the State are exempted from certain provisions of the Vehicle and Traffic Law. *However, public authorities are not considered political subdivisions of the State (see the report of the 'Temporary State Commission on Coordination of State Activities' pages 67 to 71).*

"The New York City Transit Authority states that it desires this amendment to the law to make it clear that motor vehicles which are owned by the City and operated by the Authority pursuant to a lease agreement are excepted from the provisions of the Motor Vehicle Financial Responsibility Act and the Motor Vehicle Safety Responsibility Act, to the same extent as motor vehicles owned by the City and not leased to the Authority.

"This bill would also exempt motor vehicles owned by the New York City Transit Authority from the provisions of the Motor Vehicle Financial Responsibility Act and the Motor Vehicle Safety Responsibility Act *by providing that when the term 'political subdivision' is referred to in sections 93-k and 94-ff of the Vehicle and Traffic Law, it shall be deemed to refer to and include this Authority.*

"*With respect to such motor vehicles, the New York City Transit Authority could become a self-insurer. Under the existing provisions of section 1815 of the Public Authorities Law, it is now authorized to self-insure under subdivision 4 of section 50 of the Workmen's Compensation Law*" (emphasis supplied).

The report of the Temporary State Commission on Co-ordi-

nation of State Activities (NY Legis Doc, 1956, No. 46, pp 67-70) referred to in the letter from Comptroller Levitt's counsel includes the following:

*"The Public Authority Is Not a Political Subdivision*

"Public authorities are distinguished from politcal subdivisions in the State Constitution. Significantly the State Constitution provides for the supervision by the Comptroller of the accounts of political subdivisions in one article and for public authorities in a different article * * *

"Article X, Section 5, gives further evidence of constitutional differentiation between public authorities and political subdivisions. It states: 'Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation * * *

"In this section a public corporation as defined does not include: * * * a county, city, town, village, school district or fire district or an improvement district established in a town or towns * * *

"The State's definition [of political subdivision] contemplates a politically responsible unit of government whose chief officials are generally chosen by an electorate * * *

"The Power Authority is the only existing Authority in New York State designated in its special act as a 'political subdivision' * * *

"Although the public authority in New York State is properly considered as a 'political subdivision' under the federal Internal Revenue Code, it is not so considered in New York State law. The one authority which is designated in its enabling act as a 'political subdivision' is not considered to be a political subdivision in New York State, and there has been no attempt to make applicable to it those constitutional and statutory provisions pertaining to political subdivisions. Since a public authority does not need to be termed a 'political subdivision' in order to qualify for federal tax exemption, and since the designation is not considered applicable for any purpose in New York State, it would seem that the designation should not be applied to public authorities in this State.

*"It is recommended that in future New York State legislation no public authority be designated as a 'political subdivision' within the meaning of New York State law."*

We must assume that the legislators (and certainly the Governor, as indicated by the letter to him from counsel to

Comptroller Levitt) were aware of the fact that the New York City Transit Authority was not a political subdivision of the State. However, it was deemed appropriate to provide that for the limited purposes of financial security and safety responsibility (relating to the motor vehicles operated by it) the authority should be permitted to be an unregulated self-insurer, just as New York City was when it operated its public transportation system. The method used to accomplish that purpose was by amending section 1215 of the Public Authorities Law to provide *that for the purposes of article 6* (per the present section 321) *and article 7* (per the present section 360) *of the Vehicle and Traffic Law,* the authority was to be "deemed" to be the equivalent of a political subdivision of the State, just as the Legislature had done four years earlier with regard to the provisions relating to compensation benefits for employees of the authority.

Obviously, if the authority were a political subdivision of the State, it would not have been necessary for the Legislature to enact either the 1953 or the 1957 amendments. By such amendments the Legislature clearly demonstrated an *ad hoc* approach to exemption of the authority from stated general provisions of the Workmen's Compensation and Vehicle and Traffic Laws.

An analysis of the *ad hoc* exceptions shows that they were completely logical, since it was expected that they would reduce the administrative costs of the authority without any lessening of the substantive benefits to be obtained by the persons for whose benefit the general statutes were enacted. Specifically, an employee would obtain the same compensation benefits by the authority being permitted to be a self-insurer as he would have obtained if the authority were required to provide the security therefor generally required of private employers. Similarly, a person injured as the result of the negligence of the operator of an authority bus would be assured receipt of the same moneys if the authority were an unregulated self-insurer as he would if the authority were required to be insured or to purchase an indemnity bond. Thus, there was every reason to provide that the authority should be deemed to be a subdivision of the State with reference to compensation benefits, financial security and safety responsibility.

However, it is an entirely different matter when we consider the concept of uninsured motorists coverage. If the authority

were to prevail it would mean that a passenger on its bus who was injured solely through the fault of an unidentified or uninsured vehicle would be as remediless against the authority as he generally was against the other motorist. The authority would thus have a wall of immunity surrounding it—a wall which owners and operators of vehicles in the business of transporting passengers (other than municipalities) generally do not have. It would be saving money *at the expense of the persons for whose benefit the general statutes were enacted,* which was not true of its 1953 and 1957 exclusions from the Workmen's Compensation and Vehicle and Traffic Laws.

Since the Legislature established the policy of *ad hoc* exceptions to the laws otherwise applicable to the New York City Transit Authority by piecemeal amendments of section 1215 of the Public Authorities Law, and it did not so provide when uninsured motorists coverage was mandated in 1971 as to vehicles transporting passengers for hire, it seems clear that it did not intend that the responsibility of the authority to its passengers and others should be less in this respect than that of other "person[s], firm[s], association[s] or corporation[s] engaged in the business of carrying or transporting passengers for hire" (Vehicle and Traffic Law, § 370, subd 1).

The rationale of the authority's claim that it is excepted from section 370 of the Vehicle and Traffic Law's requirement of furnishing uninsured motorists coverage starts from its assumption that it *is* a political subdivision of the State. The authority then points to the fact that *article 7* of the Vehicle and Traffic Law (relating to safety responsibility) contains a set of definitions (§ 359, subd [d]) wherein the term "person" is stated "not [to] include the state or any political subdivision thereof." The authority then calls our attention to the first sentence of section 370 (which is part of *article 8* relating to the special requirements of insurance or indemnity bonds on vehicles transporting passengers for hire). The sentence starts with the following: "Every *person,* firm, association or corporation engaged in the business". The authority then connects the two statutes by concluding that the exclusion of a political subdivision of the State in the definition of "person" in section 359 applies to the meaning of the term "every person" in section 370.

The basic error in its contention, as demonstrated above, is that the authority is *not* a political subdivision of the State. But assuming, *arguendo,* that it were, the fact remains that

article 8 (which contains no definitions) has an obviously different purpose than that of article 7. The latter relates solely to "safety responsibility", and section 359 thereof, in its lead sentence states: "The following words and phrases when used in *this article* shall, *for the purposes of this article*, have the following meanings" (emphasis supplied). There is no reason to import the definitions of article 7 into article 8, which relates to an entirely different subject matter—the special, and generally more stringent requirements imposed on one engaged in the business of transport of passengers.

In any event, the above-quoted lead sentence of section 370 (of article 8) relates not only to a "person" but also to a "firm, association or corporation engaged in the business of carrying or transporting passengers for hire", so that even if the authority is not a "person" under the definition in section 359 (on the assumption that it was a subdivision of the State) it is still a "corporation" under section 370. Therefore, by the specific language of section 370 the authority is subject to its requirements since: (1) it is (at the least) a "corporation"; (2) it is in the business of carrying passengers for hire; and (3) it is not a municipality, which is the only relevant exception contained in section 370.

### THE CONTENTION THAT SINCE THE AUTHORITY IS A SELF-INSURER IT NEED NOT PROVIDE UNINSURED MOTORIST COVERAGE

The authority points to the following words of the 1971 amendment to section 370 (subd 1, par [b]) of the Vehicle and Traffic Law: "Notwithstanding any contrary provision of this chapter, any such bond, or policy of insurance shall also provide for uninsured motorist coverage" (L 1971, ch 794). The authority argues that "if an owner of a vehicle which transports passengers for hire, chooses to insure that vehicle either through an insurance policy or an indemnity bond, it must provide uninsured motorist coverage as part of its mandatory minimum insurance" and then contends that since it has "not chosen to insure itself by the use of an insurance policy or an indemnity bond" but "has chosen to be a self-insurer" it is not required to provide uninsured motorists coverage.

Thus, the authority has seized upon the privilege given to it in 1957 to opt to be an unregulated self-insurer (based on its belief that this would reduce its expenses) to claim that it

thereby became exempt from the 1971 requirement of providing uninsured motorist coverage for its passengers.

As previously indicated, the 1953 and 1957 amendments to section 1215 of the Public Authorities Law in no way diminished the substantive rights of anybody, since it was assumed that the authority could properly handle compensation and motor vehicle liability claims without becoming insolvent, and that the cost of self-insurance would be less than that of insurance or indemnity bonds. There was every reason for a legislator to vote for such amendments and no apparent reason why he should not. It would be ironic that those privileges, so favorable to the authority, should be converted from their original intent so that the authority would not be subject to the substantive obligations of other carriers to their passengers and other persons injured as the result of a motor vehicle accident.

It is not rational to believe that the 1971 Legislature intended that the mandate of uninsured motorists coverage as applied to a carrier of persons depended upon whether the carrier had previously chosen to be a self-insurer to save the conceived additional expense of an indemnity bond or insurance policy. If anything, a carrier's insurance responsibility to its passengers and others should be greater, and not less, than that of other owners or operators of motor vehicles. This is indicated by the fact that as far back as 1932, long before New York provided for compulsory insurance of motor vehicles registered in the State, such carriers were required to be insured or to provide an indemnity bond. It would indeed be strange that a carrier was to be exempt from the obligation to provide uninsured motorists coverage when the owner of even a single vehicle is required to provide it—merely by the fortuity that it had chosen the self-insurance option as to financial security and safety responsibility.

The vital relevant portion of section 370 of the Vehicle and Traffic Law is its initial sentence beginning, "Every person, firm, association or corporation engaged in the business of carrying or transporting passengers for hire in any motor vehicle * * * except * * * motor vehicles * * * owned and operated by a municipality". The authority *is* such "person, firm, association or corporation" and the bus here in question was not *operated* by "a municipality". Therefore, it is not exempted by section 370. The essence of the 1971 amendment to section 370 (subd 1, par [b]) was that such "person, firm,

association or corporation" was newly required to furnish uninsured motorists coverage. To the Legislature it must have seemed that an appropriate method of achieving this was to state that the indemnity bond or insurance policy (the only alternatives mentioned in the titles to article 8 and section 370) was to contain such provision for uninsured motorists,[2] but this was only a means to express the desired end. The "end" was to furnish uninsured motorists coverage unless the vehicle used in the business of transporting passengers was *both* owned and operated by a municipality. We may not ignore the "end" merely because the "means" was expressed in an incomplete manner when the result would be an absurdity (see McKinney's Cons Laws of NY, Book 1, Statutes, § 143; § 363, pp 527-528).

LAZER, J. P., RABIN and MARGETT, JJ., concur.

Judgment of the Supreme Court, Kings County, dated March 31, 1978, and order of the same court, dated October 4,

---

**2.** The Legislature's error was in assuming that pursuant to section 370 of the Vehicle and Traffic Law an insurance policy or indemnity bond were the only choices available to an entity engaged in the business of transporting passengers for hire. This error may have been caused, as aforestated, by relying on the titles of article 8 ("Indemnity Bonds or Insurance Policies on Vehicles Transporting Passengers for Hire") and section 370 ("Indemnity bonds or insurance policies"). This is indicated by the Division of Budget's approving recommendation, dated June 8, 1971, which is contained in the legislative bill jacket. This report states the following:

"1. *Subject and Purpose:* This bill would require that insurance policies on for-hire vehicles provide uninsured motorists coverage.

"2. *Summary of Provisions:* Under present law, owners of vehicles which transport passengers for hire are required only to have standard liability insurance coverage on their vehicles. Effective September 1, 1971, this bill would * * * [r]equire that indemnity bonds and/or insurance policies on for-hire vehicles provide uninsured motorists coverage."

The error was in not realizing that (1) subdivision 3 of section 370 provided the additional option of regulated self-insurance to entities "engaged in the business of renting or leasing motor vehicles, having registered in this state more than twenty-five motor vehicles", and (2) the 1957 amendment to section 1215 of the Public Authorities Law exempted the authority from the requirements of section 321 (relating to financial security) and section 360 (relating to safety responsibility) of the Vehicle and Traffic Law so that the authority was permitted to be an unregulated self-insurer. It is as irrational to believe that the Legislature intended that authority buses were to be exempt from uninsured motorists coverage as to believe that Hertz passenger vehicles were to be so exempt, merely because both the authority and Hertz had been given the privilege of opting to be self-insurers (the authority by the 1957 amendment to section 1215 of the Public Authorities Law, and Hertz by the 1962 amendment to subdivision 3 of section 370 of the Vehicle and Traffic Law.

1978, both affirmed, with one bill of $50 costs and disbursements.