SPRING VALLEY GARDENS ASSOCIATES et al., Respondents, v VICTOR MARRERO, as Commissioner of the State of New York Division of Housing and Community Renewal, et al., Defendants, VILLAGE OF SPRING VALLEY, Appellant. (Action No. 1.)

JOSEPH FELD et al., Respondents, v JOSEPH B. GOLDMAN, as Acting Commissioner of the State of New York Division of Housing and Community Renewal, et al., Defendants, VILLAGE OF SPRING VALLEY, Appellant. (Action No. 2.)

JHW CONSTRUCTION CORP., Respondent, v VICTOR MARRERO, as Commissioner of the State of New York Division of Housing and Community Renewal, et al., Defendants, VILLAGE OF SPRING VALLEY, Appellant. (Action No. 3.)

TOWER PROPERTIES, Respondent, v RICHARD BERMAN, as Commissioner of the State of New York Division of Housing and Community Renewal, et al., Defendants, VILLAGE OF SPRING VALLEY, Appellant. (Action No. 4.)

SADIE FARKAS et al., Respondents, v RICHARD BERMAN, as Commissioner of the State of New York Division of Housing and Community Renewal, et al., Defendants, VILLAGE OF SPRING VALLEY, Appellant. (Action No. 5.)

BERRY ESTATES, INC., et al., Respondents, v DIVISION OF HOUSING AND COMMUNITY RENEWAL OF THE STATE OF NEW YORK, Defendant, VILLAGE OF SPRING VALLEY, Appellant. (Action No. 6.)

STEVEN PEKOFSKY et al., Respondents, v DIVISION OF HOUSING AND COMMUNITY RENEWAL OF THE STATE OF NEW YORK, Defendant, VILLAGE OF SPRING VALLEY, Appellant. (Action No. 7.)

Second Department, March 19, 1984

**APPEARANCES OF COUNSEL**

*Michael A. Stone, Village Attorney* (*Sammy Giament* of counsel), for Village of Spring Valley.

*Donald Tirschwell* (*Ellen B. Holtzman* on the brief), for Steven Pekofsky and others, respondents-appellants.

*Milton B. Shapiro* for respondents in Actions Nos. 1, 3 and 6.

*Dubbs & DePodwin* (*Leslie P. Simon* on the brief), for respondents in Action No. 2, and *Jacobson & Jacobson* (*Murray Jacobson* on the brief), for respondents in Actions Nos. 4 and 5.

**OPINION OF THE COURT**

GIBBONS, J. P.

At issue is the validity of a resolution of the defendant village, made pursuant to subdivision a of section 3 of the

Emergency Tenant Protection Act of 1974 (hereinafter ETPA; L 1974, ch 576, § 4). The resolution states that prior to a public hearing, which was held on December 5, 1978, the village "surveyed rental units for the purpose of determining the number of vacant units in each Multiple-Dwelling", and that "as a result of the public hearing and the statistics compiled by the Village of Spring Valley relating to vacancy rates and rental conditions, the Board of Trustees finds that the vacancy rate in residential units in the Village of Spring Valley is lower than five percent". The board of trustees of the village "resolved" that a public emergency existed "requiring the regulation of residential rents in all residential housing accommodations" in the village and that "the vacancy rate in all such housing accommodations does not exceed five percent".

Plaintiffs in these seven declaratory judgment actions contend that the finding as to the vacancy rate was defective and that the ensuing rent guidelines, as well as the resolution, should be declared null and void. The Supreme Court, Rockland County, held in their favor. We disagree and declare the resolution valid.

The attack on the resolution is two-pronged. The first is that the survey conducted by the village of the 53 complexes containing six or more apartments (hereafter the sixes) was inadequate, so that the conclusion drawn therefrom as to the vacancy rate of the sixes was inaccurate. The other is that the failure to survey buildings containing five or fewer apartments (hereafter the under-sixes) invalidated the village's declaration that an emergency existed, as stated by the village, "in *all* residential housing accommodations in the [v]illage" (emphasis supplied).

The ETPA authorizes a city, town or village to declare a housing emergency and impose local housing rent control. Subdivision a of section 3 of the ETPA (L 1974, ch 576, § 4 [§ 3, subd a]) provides, in relevant part, as follows: "The existence of public emergency requiring the regulation of residential rents for all or any class or classes of housing accommodations * * * shall be a matter for local determination within each city, town or village. Any such determination shall be made by the local legislative body of such city, town or village on the basis of the supply of housing

accommodations within such city, town or village * * * and the need for regulating and controlling residential rents within such city, town or village. A declaration of emergency may be made as to any class of housing accommodations if the vacancy rate for the housing accommodations in such class within such municipality is not in excess of five percent and a declaration of emergency may be made as to all housing accommodations if the vacancy rate for the housing accommodations within such municipality is not in excess of five percent."

Subdivision a of section 5 of the ETPA (L 1974, ch 576, § 4 [§ 3, subd a]) states that "[a] declaration of emergency may be made * * * as to all or any class or classes of housing accommodations in a municipality, except", and it then lists exceptions in 11 numbered paragraphs. Among these are under-sixes; public housing; housing owned or operated by a hospital, convent, monastery, public institution, school or college; hotels and tourist homes; and motor courts.

On August 28, 1978, the then Village Attorney sent letters and questionnaires to the owners of 53 buildings containing 4,786 apartments. She had obtained the names and addresses of the owners of apartment buildings having six or more sewer units from the assessment records.[1] The questionnaire requested, *inter alia,* the number of units and the number and identity of the vacant apartments as of September 5, 1978. The letter stated that if the Village Attorney received no answer, she would assume there were no vacancies. The Village Attorney testified that she sent no letters and made no inquiry as to the under-sixes. On cross-examination the Village Attorney was asked whether she surveyed rooming houses and she said no. Apparently, she also made no survey of other exempt classifications, such as hotels, motor courts, convents, monasteries, and school dormitories (although included in her survey of the sixes were "low income cooperative[s]" which apparently were exempt pursuant to section 5 [subd

---

1. The Village Attorney testified as follows: "It is conceivable that some of the letters that went out were to buildings that had five units or four units, because the numbers on the assessment rolls referred to the sewer units which are more than the actual number of apartments". For the reasons hereafter stated in footnote 7, we believe that this did not taint the survey of the sixes.

a, par (3)] of the ETPA [L 1974, ch 576, § 4 (§ 5, subd a, par [3]), as amd L 1978, ch 655, § 137]).

At the trial the plaintiffs introduced into evidence informal and apparently incomplete handwritten notes of the inspectors who were assigned by the Village Attorney to ascertain the vacancies in the sixes whose owners had not responded to the August 28, 1978 letter. These notes reveal that 12 of the 31 sixes visited by the inspectors had no vacancies and that in the case of 7 of the visited complexes, the superintendents refused to give the requested information without the landlords' approval. The landlords apparently failed to give such approval.

On October 11, 1978 the Village Attorney sent a follow-up letter and another copy of the questionnaire to those who had neither responded nor permitted inspection, and she warned that if there were no response by October 20, 1978, she would assume that there were no vacancies. On November 6, 1978 she reported to the board of trustees that she had the requisite information as to 37 of the sixes since 18 of the 53 had responded in writing and 19 others had been inspected. Based on this survey and the assumption of no vacancies as to the 16 nonanswering, uninspected complexes, she concluded that the vacancy rate of all of the sixes on September 5, 1978 was less than 2%.[2] When asked, in effect, how a survey limited to sixes could be a proper basis for a resolution declaring that the vacancy rate "in *all* [residential] housing accommodations [in the village] does not exceed five percent", she answered: "The [ETPA] gives us two options in declaring an emergency as to all housing accommodations or to declare an emergency as to a particular classification. Insofar as the declaration of emergency was concerned, the emergency was declared as

---

**2.** At trial, the appellant village's trial counsel did not ask the Village Attorney to state the details of the survey. Indeed, the court refused to permit trial counsel for the village to elicit from her the particulars of "how she determined the two percent". As a result, the record does not include the raw data of the number of vacancies and the total number of apartments in the 37 complexes as to which full information had been received. If the vacancy rate pursuant to the Village Attorney's formula (based on including the input of zero vacancies from the inspection) was 2%, and if we assume that the average number of apartments and the vacancy rate of the 16 nonresponders was equal to those of the responders, then algebraically the vacancy rate of the 37 responders would be 2.86%. (This is based on the following [1] assign x as the vacancy percentage of the 37 responders; [2] based on the Village Attorney's assignment of zero vacancies to the remaining 16 of the 53 complexes, $\frac{37x + 0}{53} = .02$; [3] therefore, x = .0286).

to all housing accommodations, *meaning all housing accommodations that could be included under the act*" (emphasis added).

The assessment records revealed, as indicated by a search made by a witness produced by plaintiffs, that there were 63 properties in the village with 3 to 5 apartments or sewer units and that the total number of such apartments or units was 225.

The trial court held that the village's acceptance of its attorney's assumption of no vacancy in the 16 unresponsive sixes rendered the resolution invalid because "the owners of the real property were deprived of the full benefit of such ownership * * * by an assumption made rather than by an accurate and complete survey which was required by law". Under the circumstances, we disagree.

It is to be noted that although the enabling statute (L 1974, ch 576, § 4 [ETPA, § 3, subd a]) requires, as a basis for declaration of an emergency, that the vacancy rate of any class or all of the housing accommodations be "not in excess of five percent", no method is stated as to how this fact is to be ascertained. The statute states only the generality that it "shall be a matter for local determination within each city, town or village" (L 1974, ch 576, § 4 [ETPA, § 3, subd a]).[3] Although such determination may not be made on less than reasonable grounds, we see nothing in the statute requiring, as stated by the trial court, a "complete survey", if by that term it is meant that information as to all of the buildings in the relevant classification must be obtained. "Survey" as used in the Local Emergency Housing Rent Control Act (L 1962, ch 21, § 1) could not possibly mean this, if for no other reason than the tremendous number of buildings involved. Further, assuming that a "survey" was indeed required (cf. *Seasons Realty Corp. v City of Yonkers,* 80 Misc 2d 601, 607), that term is defined in Webster's New International Dictionary as "a study of a specified * * * aggregate of units

---

**3.** We note, by comparison, that the State rent control law relating to New York City (Local Emergency Housing Rent Control Act, L 1962, ch 21, § 1; amd L 1963, ch 393, § 1; L 1965, ch 318, § 1; L 1966, ch 13, § 1; L 1967, ch 657, § 1), after stating that the declaration of an emergency "shall be a matter for local determination" states that this is dependent upon the making of "a survey which the city shall cause to be made of the supply of housing accommodations" at least once every three years.

\* \* \* with respect to a special condition or its prevalence or with the objective of drawing conclusions *about a larger* \* \* \* *aggregate*". Certainly a review of 69.8% of the relevant complexes (i.e., 37 of the 53 sixes) is sufficient for "drawing conclusions about [the] larger \* \* \* aggregate".

We believe that a more relevant claim of defect, then, is not whether information as to the vacancies and occupancies of all of the sixes had to be obtained, but whether the village's attribution of zero vacancies to the sixes owned by the 16 continuing nonresponders fatally tainted the conclusion that the vacancy rate of all of the sixes was less than 5%. We must consider this in light of the fact that the village's declaration of emergency was a legislative act and therefore presumptively valid. The degree of proof required for a successful attack was formulated by this court in *De Sena v Gulde* (24 AD2d 165, 169 [opn by HOPKINS, J.]), as follows: "When a municipal legislative body enacts an ordinance, a presumption of validity attaches to its resolution (*Rodgers* v. *Village of Tarrytown,* 302 N.Y. 115; *Shepard* v. *Village of Skaneateales,* 300 N.Y. 115). The presumption of validity has the effect of (1) imposing the burden of proof on the party questioning the ordinance; and (2) sustaining the ordinance if the propriety of its enactment is fairly debatable. The content of the burden on the assailant is sometimes said to extend further than a mere preponderance of the evidence to proof beyond a reasonable doubt (*Wiggins* v. *Town of Somers,* 4 NY2d 215; but, see, *Thomas* v. *Town of Bedford,* 29 Misc 2d 861, 866, affd. 15 AD2d 573, affd. 11 NY2d 428). Still, the presumption is not irrebuttable (*Arverne Bay Constr. Co.* v. *Thatcher,* 278 N.Y. 222), and perhaps we may best rationalize the presumption as a reminder of the force of legislative judgment which must be supported by the courts if there is 'any state of facts either known or which could reasonably be assumed' on which the ordinance could be based (*United States* v. *Carolene Prods. Co.,* 304 U.S. 144, 154; cf. *Town of Islip* v. *Summers Coal & Lbr. Co.,* 257 N.Y. 167)."

In support of our conclusion that the resolution is valid, we note the following:

1. The resolution minutes state that at the public hearing the Village Attorney said that "[s]everal apartment

owners did not respond to the questionnaire and did not permit inspection of the apartments. *In those cases,* the Village considered that no vacancy existed" (emphasis supplied). It does not appear that the representative of the Rockland County Apartment Owners Association (or any of the other persons who were present) contested the assertion that the assumption of no vacancy was made *only* as to owners of sixes who had refused inspection after failing to respond to the original letter and questionnaire.

2. The owners of the nonresponding sixes were given a second opportunity, after their refusal to permit inspection, to respond to a newly sent questionnaire and failed to do so despite the repeated *caveat* that "[i]f we do not hear from you, we will have to assume that there were no vacancies * * * on September 5, 1978".

3. The fact that inspection of the 24 complexes whose nonresponding owners permitted inspection revealed that half of them had no vacancies and that owners who might have had a low percentage of vacancies had a self-interest in not disclosing this information, permitted the reasonable inference that the owners who did not permit inspection had a very small number of vacancies or none — especially since such owners had been twice warned of the consequences of no response.

4. The fact that the "less than two percent vacancy rate" found by the Village Attorney translates into the probability of substantially less than a 3% vacancy rate for the 37 complexes as to which vacancy data had been obtained[4] reasonably permitted the inference that the vacancy rate of the 53 complexes was substantially less than 5%.

5. The sending of the two sets of letters and questionnaires and the interim inspections (permitted and nonpermitted) made by five inspectors constituted a good-faith effort to obtain a reasonable survey.

6. Plaintiffs' expert witness indicated, in response to a hypothetical question asked by plaintiffs' counsel, that data compiled from 16 apartment complexes with approximately 1,840 units was not sufficient to establish a statistically sound vacancy rate for 53 apartment complexes with

4. See n 2.

4,786 units. However, the record reveals that the necessary data was received as to 37 of the complexes and that 16 was the number of the complexes as to which no information was received.[5]

7. Since a good-faith study was made based on precise data obtained from a substantial majority of the complexes, it would be anomalous to hold that those who refused to co-operate with the statistical study should benefit from their stubborn and studied silence. If it be argued that the landlords who co-operated should not suffer the consequences of the non-co-operation of the others, the answer is that it would have been a simple matter for plaintiffs to produce at the trial herein, by subpoena if necessary, the relevant statistics of the 16 noncomplying sixes.

The presumption of validity casts the burden of proof upon the plaintiffs who are questioning the legality of the village's declaration of public emergency (*De Sena v Gulde,* 24 AD2d 165, *supra*). This burden has not been met. Accordingly, the declaration prevails against the attack based on the village's assignment of a zero vacancy rate to the 16 nonresponding sixes.[6]

The other alleged defect, as aforestated, is that there was no survey or consideration of the vacancy rate of the under-sixes. Plaintiffs acknowledge that pursuant to section 5 of the ETPA (L 1974, ch 576, § 4 [§ 5], as amd L 1978, ch 655, § 137, eff July 25, 1978) this class was one of the 11 kinds of housing accommodation that could not be the subject of a declaration of emergency. They, nevertheless, argue that the village's undifferentiated finding as stated in its resolution, "that the vacancy rate in residential rental units in [the village] is lower than five percent", and its subsequent resolution that "a public emergency exist [*sic*] requiring the regulation of residential rents in all residential housing accommodations" in the village, mandated an analysis

---

5. The expert further testified that a 95% response rate was necessary to obtain valid statistical data, an opinion which we deem incredible in the absence of proof that the statistics obtained from 69.8% of the complexes indicated a vacancy rate so close to 5% that a more substantial percentage of the complexes had to be surveyed.

6. Pragmatically, our decision is not the last word, since, at any time after the declaration of emergency, the municipality must declare it at an end upon being shown that the vacancy rate now exceeds 5% (L 1974, ch 576, § 4 [ETPA, § 3, subd b]).

of the under-sixes as well as the sixes. They argue that subdivision a of section 3 of the ETPA (L 1974, ch 576, § 4 [§ 3, subd a]) gives the village the option of declaring an emergency either as to all housing accommodations or "any class of housing accommodations if the vacancy rate for the housing accommodations in such class * * * is not in excess of five percent", and that the village's choice of the former required it to make analysis of the vacancy rate of all accommodations, including the under-sixes.

Plaintiffs' argument presupposes that if the village had declared the emergency only as to sixes, a survey limited to that class might have passed muster. However, the fact remains that whether or not full obeisance was formalistically made to the wording of subdivision a of section 3 of the ETPA (L 1974, ch 576, § 4 [§ 3, subd a]), section 5 of the same act states that a declaration of emergency cannot be made as to under-sixes, any more than it could be made as to college dormitories or convents. As testified to by the Village Attorney at the trial, "the emergency was declared as to all housing accommodations, meaning all accommodations that could be included under the act". Although this is the self-serving statement of the counsel who imperfectly drafted the resolution, it is, indeed, the fact that no declaration of emergency could legally attach to the under-sixes. As stated by Justice SHAPIRO in the case of *Matter of New York City Tr. Auth. (Thom)* (70 AD2d 158, 172, affd 52 NY2d 1032), "[w]e may not ignore the 'end' merely because the 'means' was expressed in an incomplete manner when the result would be an absurdity".

Plaintiffs, nevertheless, argue that the decision of this court in *Central Plains Co. v City of White Plains* (48 AD2d 326) mandates a survey of all exempt housing (i.e., the 11 classes of housing accommodations as to which, per section 5 of the ETPA, a declaration of emergency may *not* be made), as a condition to a declaration of emergency. There the plaintiff landlords sought to nullify the imposition of rent control in the City of White Plains because the city's survey, showing a less than 5% vacancy rate, included the input of a particularly low vacancy rate of one of the exempt classes, to wit, public housing. The issue was whether this exempt class could properly be included, not

whether such inclusion was mandated. It was raised in the context of the fact that the parties agreed that, but for the inclusion of the exempt class of public housing, " 'that survey would have established a vacancy rate of in excess of 5% thus precluding a declaration of emergency' " (*Central Plains Co. v City of White Plains, supra,* p 329). The court held that the inclusion of public housing in the survey was appropriate. It said (p 330):

"The fact that the Act specifically precludes a local government from regulating certain enumerated housing as defined in subdivision a of section 5 simply embodies the legislative restriction that housing already regulated should not be burdened with additional local regulation. But this directive has no bearing on the total number of housing units which are in fact available in a local area. In order to determine this a municipality must, as the City of White Plains has, survey all units within its city confines. The term exempt housing means, therefore, exempt from regulation under the Act, not exempt from consideration in determining vacancies * * *

"The plaintiffs may be correct that the exempt housing is always fully occupied and therefore an emergency situation may exist at all times since the vacancy rate in the nonexempt housing would have to be extremely great to offset the zero vacancy rate in the exempt units (see *Amsterdam-Manhattan Inc. v City Rent & Rehabilitation Administration,* 15 NY2d 1014, 1015-1017 [dissenting opn.]). However, it should be noted that the alleged full occupancy in the exempt categories may be an indicator of the unavailability of housing in the nonexempt sector. And, as previously noted, it is the scarcity of housing in an entire community which triggers an emergency declaration for an entire city."

Plaintiffs focus upon the phrase in the decision in the *Central Plains Co.* case (*supra,* p 330) that "a municipality must * * * survey all units within its city confines" and argue that this is an absolute. They disregard the factual background that the parties in that case stipulated that the inclusion or exclusion of the large number of public housing apartments and the latter's proven low vacancy rate were the controlling factors as to whether the total

vacancy rate was less or more than 5%. Here, on the other hand, the landlords submitted no proof at the public hearing or at the trial that the vacancy rate of the 225 apartments in the houses containing 3 to 5 apartments could possibly shift the balance to above 5% despite the fact that a survey of 69.8% of the sixes indicated a probable vacancy rate in the 4,786 apartments contained in all of the sixes of less than 3%.

The court in the *Central Plains Co.* case could not have literally meant that the units of all 11 of the exempt classes must be surveyed, since the record on appeal in that case includes a table which lists 6 of the 11 types of buildings that are excepted in section 5 of the ETPA as "<u>Not surveyed</u>" (underlining in original). If plaintiffs' absolutist interpretation were correct, the failure to survey convents, asylums, motor courts and tourist homes (L 1974, ch 576, § 4 [§ 5, subd a, pars (6), (8)]) would invalidate a declaration of emergency, and the court in the *Central Plains Co.* case (*supra*) would have been required to nullify such declarations.

The issue in the *Central Plains Co.* case was not whether all exempt classes had to be surveyed, but whether one particularly large exempt class could be included in the survey where there was proof of a proximate relationship between such inclusion and the presence or absence of an over-all 5% vacancy rate. The decision that the inclusion in such case was valid was, *inter alia,* an illustration of the presumption of validity of a legislative determination of a municipality. The same presumption should be applied where a municipality chooses to exclude from its survey a comparatively small exempt class where there was no indication of a proximate relationship between its vacancy rate and the presence or absence of a vacancy rate in excess of 5%. The statement of the court in the *Central Plains Co.* case (48 AD2d 326, 330, *supra*), that "a municipality *must* * * * survey all units within its city confines" was dictum that the court itself did not follow. Likewise, we decline the invitation to follow it.

A commonsense approach must be applied. Plaintiffs failed to produce any proof indicating that despite the comparatively small number of under-sixes and that there

was no general reason to assume that the vacancies in the under-sixes in Spring Valley were unusually high, a survey of the under-sixes would have tipped the balance to an over-all vacancy rate in excess of 5%. Plaintiffs have failed to meet their burden of proof.[7]

Accordingly, the judgment dated November 3, 1982 should be reversed, and the two judgments dated November 18, 1982 should be reversed insofar as appealed from, on the law, the resolution of the village, dated December 5, 1978, declaring an emergency requiring the regulation of residential rents should be declared to be valid and the moneys held in escrow by the Rockland County Clerk as "excess rents" should be returned to the tenants who paid them.

THOMPSON, J. (dissenting). At issue in these consolidated actions is the validity of a December 5, 1978 resolution of the Board of Trustees of the Village of Spring Valley which provides, *inter alia:* "NOW, THEREFORE, BE IT RESOLVED, by the Board of Trustees of the Village of Spring Valley that a public emergency exist [*sic*] requiring the regulation of residential rents *in all residential housing accommodations* in the Village of Spring Valley" (emphasis supplied). The resolution was allegedly passed pursuant to the dictates of the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4, hereinafter ETPA). The ETPA was enacted to deal with the problems arising out of an existing housing shortage. Subdivision a of section 3 thereof provides, in pertinent part:

"§ 3. Local determination of emergency; end of emergency

"a. The existence of public emergency requiring the regulation of residential rents for all or any class or classes of housing accommodations * * * shall be a matter for local determination within each city, town or village. Any such determination shall be made by the local legislative body

---

**7.** We add the fact that, as testified by the Village Attorney, while "[i]t is conceivable" that some of the letters sent to owners of buildings having six or more sewer units might have resulted in inclusion in the survey of buildings having less than six apartments, such could not have tainted the survey. We note that plaintiff submitted no proof that such was the case. Further, since it is necessarily plaintiffs' implicit argument that under-sixes had a higher rate of vacancies than sixes, under such hypothesis the leaching of some of the under-sixes into the survey of the sixes would have resulted in a higher vacancy rate.

of such city, town or village on the basis of the supply of housing accommodations within such city, town or village, the condition of such accommodations and the need for regulating and controlling residential rents within such city, town or village. A declaration of emergency may be made as to any class of housing accommodations if the vacancy rate for the housing accommodations in such class within such municipality is not in excess of five percent" (L 1974, ch 576, § 4 [§ 3, subd a], amd L 1980, ch 69, § 4).

I believe the challenged resolution is invalid because the crucial 5% vacancy determination, allegedly encompassing only buildings with six or more apartment units, was calculated in a thoroughly inadequate and haphazard manner. In addition, the resolution in issue fails to specify that it deals with buildings of six or more units, despite the clear statutory authority to specify such a limited category of residential housing. Instead, the broad language of the resolution covers "all residential housing accommodations in the Village of Spring Valley". In light of the conceded failure to even attempt to survey this broad class of housing, the resolution is invalid.

At the outset, several pertinent observations must be made with regard to the governing standard of review. The majority places great reliance on the presumed validity of the resolution, which it characterizes as legislative in nature, and the failure of the landlords to rebut the presumption of validity. In *Matter of Jewett v Luau-Nyack Corp.* (31 NY2d 298, 305-306), the Court of Appeals noted: "An ordinance is distinguished from a resolution by the greater formality required for its enactment (Village Law, § 90; 5 McQuillin, Municipal Corporations, § 15.02, *supra*). An ordinance provides a permanent rule of government or conduct designed to affect matters arising subsequent to its adoption (*Matter of Edgewood Ave. in City of Mount Vernon,* 195 Misc. 314, 323-324, affd. 276 App. Div. 853; *Town of Poestenkill* v. *Sicho,* 54 Misc 2d 191, 194; *Russell Sage Coll.* v. *City of Troy,* 24 Misc 2d 344, 345-347; *Kij* v. *Aszkler,* 163 Misc. 63, 64; 5 McQuillin, Municipal Corporations, § 15.02, esp. at p. 43, and § 15.06, esp. at p. 57, *supra*). A resolution deals with matters of a temporary or special nature, where the action taken generally involves

findings of fact and may be characterized as administrative (*Matter of Collins* v. *City of Schenectady,* 256 App. Div. 389, 392, *supra;* 1 Antieau, Municipal Corporation Law, § 4.05; *Kleiber* v. *City of San Francisco,* 18 Cal. 2d 718, 724, *supra; Allen* v. *Wise,* 204 Ga. 415, 417)."

The resolution in issue, dealing with a temporary housing emergency, and contingent upon a factual finding of a vacancy rate not in excess of 5%, could fairly be characterized as the product of an administrative determination. An administrative determination of vacancy rates would then have to be supported by substantial evidence in the record.

Even accepting the majority's characterization of the resolution, the fact findings upon which legislation is based (in this instance the fact of a vacancy rate not in excess of 5%) are entitled to a mere rebuttable presumption of validity (see *Wiggins v Town of Somers,* 4 NY2d 215; *Defiance Milk Prods. Co. v Du Mond,* 309 NY 537; 40 NY Jur, Municipal Corporations, § 725). In addition, a statutory restriction on the right of a landlord to charge rent for his property should be strictly construed, so that the key 5% determination provision of the statute should be read to require careful computations before a determination limiting the right to charge rent is reached (see McKinney's Cons Laws of NY, Book 1, Statutes, §§ 311, 312; *Merritt v Village of Portchester,* 71 NY 309).

Even accepting the presumption of validity of the fact findings upon which the resolution is based, the record herein supports the conclusion of the Supreme Court that the presumption has been rebutted. As previously noted, the challenged resolution covers all residential housing in the Village of Spring Valley. In light of the conceded failure to even attempt to survey the vacancy rate for all of the residential housing in the village, the resolution is invalid.

The majority ignores this fatal flaw by accepting the argument that it was not necessary to survey what the majority terms the "under-sixes" and other exempt properties because a declaration of a rental emergency would have no practical effect on the rents that could be charged for the exempt properties. This stance ignores the entire premise of the ETPA as well as this court's previous

decision in *Central Plains Co. v City of White Plains* (48 AD2d 326, 329-330), which states, in pertinent part:

"We find, however, that the Act is clear and unambiguous * * * The statute succinctly states that when the vacancy rate for 'housing accommodations within such municipality is not in excess of five percent' an emergency may be declared. It makes no exclusions. *When the statute speaks of all housing in a city and its concomitant vacancy rate, it means precisely that, all housing.* The fact that the Act specifically precludes a local government from regulating certain enumerated housing as defined in subdivision a of section 5 simply embodies the legislative restriction that housing already regulated should not be burdened with additional local regulation. But this directive *has no bearing on the total number of housing units which are in fact available in a local area.* In order to determine this a municipality must, as the City of White Plains has, survey all units within its city confines. *The term exempt housing means, therefore, exempt from regulation under the Act, not exempt from consideration in determining vacancies.* Although there is not unanimity of opinion, letters from the State Rent Administrator and the State Commissioner of the Division of Housing and Community Renewal, contained in the record on this appeal, support this position. And Mr. Justice BEISHEIM, in a case very similar to the instant one, specifically rejected the argument that exempt housing may not be included in a companion survey conducted by the City of Yonkers (*Seasons Realty Corp. v City of Yonkers,* 80 Misc 2d 601).

"The plaintiffs may be correct that the exempt housing is always fully occupied and therefore an emergency situation may exist at all times since the vacancy rate in the nonexempt housing would have to be extremely great to offset the zero vacancy rate in the exempt units (see *Amsterdam-Manhattan Inc. v City Rent & Rehabilitation Administration,* 15 NY2d 1014, 1015-1017 [dissenting opn.]) However, it should be noted that the alleged full occupancy in the exempt categories may be an indicator of the unavailability of housing in the nonexempt sector. And, as previously noted, *it is the scarcity of housing in an entire community which triggers an emergency declaration*

*for an entire city.* In any event, the Act merely permits a municipality to declare an emergency when the rental units become scarce, but does not compel such a declaration. When a statute is clear, as this Act is, courts must effectuate its mandate." (Emphasis supplied.)

Without a survey having been conducted as to all Spring Valley residential units, including exempt properties, there is no basis in the record for concluding that a housing emergency exists. Although there might be a shortage of units in larger buildings of six or more units, the potential availability of housing in smaller buildings and other accommodations means that there might be a great deal of housing available in the Spring Valley market as a whole.[*] Accordingly, there is no basis for concluding there is an emergency with regard to all residential housing accommodations in Spring Valley.

Even if I could accept the view that it was only necessary to survey buildings with six or more rental units, my position would remain unchanged because the procedure used to survey these units to determine vacancy rates was woefully inadequate. The survey was conducted solely on the initiative of the Village Attorney, a person who was neither a survey taker nor a statistical technician. Landlord records were never subpoenaed. Ms. Ulman sent out a series of two letters. The first referred to Spring Valley's "annual survey", although the uncontroverted testimony established that no survey was conducted in 1975, 1976, and 1977. The letter, although making reference to the ETPA, never focused upon the fact that a survey was being conducted to determine if it was necessary to limit the right of a landlord to charge rent based upon requisite vacancy calculations. The threat of the letters, which was carried out, to presume a zero vacancy rate, is unacceptable. The presumption was created by neither statute nor case law, but by a Village Attorney who was not empowered to create such a presumption. Nor does the record

---

\* The record indicates that the assessment rolls contained 63 properties with APT designations, covering five or fewer units. There were also 337 designations for R-2, which includes two-family dwellings. There is no indication in the record as to the vacancy rate for other forms of exempt housing accommodations. Doris F. Ulman, the former Village Attorney, conceded there were a "couple of hundred" apartments in buildings containing fewer than six apartments.

contain any statistical basis for concluding that a nonresponder should be deemed to have a zero vacancy rate, as opposed to a rate consistent with responders.

It strikes me as quite odd that only 18 out of 53 landlords responded to a letter which might have had so great an impact on their right to determine what rents they could charge. It would be a fair conclusion that this was because the significance of the letter was never adequately set forth. The record is also devoid of any explanation as to why only 19 of 35 nonresponders were subsequently visited by building inspectors. If the presumption of a zero vacancy rate was valid, it should have been applied to all 35 nonresponders, and if it was invalid, all 35 nonresponders had to be surveyed. The testimony of the sole statistical expert in this case was that the failure to survey 16 of the 53 landlords rendered the vacancy rate calculation too questionable to be relied upon. Furthermore, the testimony of Mark Weidman, a managing partner of a 296-unit complex with 23 vacancies, that he never received the crucial survey questionnaire, was never controverted. In short, I fear that the determination of the Village Attorney was in reality based on, in her own words, "the survey, together with *my own particular knowledge* of the housing situation in the village of Spring Valley" (emphasis supplied). Her personal knowledge simply could not serve as the substitute for a properly conducted, statistically sound survey.

In summary, I find myself in disagreement with the majority because it ignores the plain language of the ETPA. A resolution covering all residential housing accommodations must be based on a survey of all such units. The plain language of the statute and case law demand no less.

I also believe that the majority has improperly shifted the burden to make the determination as to the crucial vacancy rate from the village to the landlords. This has been accomplished by allowing the minimal effort of the village in conducting a seriously deficient survey to shift the burden to the landlords to rebut the vacancy rate determination. The village should be required to conduct an adequate survey in the first instance. Accordingly, I

respectfully dissent and vote to affirm the judgment dated November 3, 1982 and the two judgments dated November 18, 1982 insofar as appealed from.

NIEHOFF and RUBIN, JJ., concur with GIBBONS, J. P.; THOMPSON, J., dissents and votes to affirm the judgment dated November 3, 1982 and the two judgments dated November 18, 1982 insofar as appealed from, with an opinion.

Judgment of the Supreme Court, Rockland County, dated November 3, 1982 (in actions numbered 1 to 5) reversed, on the law, and two judgments of the same court, both dated November 18, 1982 (in actions numbered 6 and 7, respectively), reversed insofar as appealed from by defendant Village of Spring Valley, on the law, it is declared that the resolution of the Village Board of Village of Spring Valley dated December 5, 1978 is valid, and it is directed that any and all moneys deposited by any of the plaintiffs with the Rockland County Clerk pursuant to the terms of any previously entered preliminary injunction requiring the escrowing of "excess rents" pending entry of final judgments in these actions, be paid over by said clerk to the tenants who initially paid them to the plaintiffs, together with any accrued interest thereon, less any handling fees to which said clerk may be entitled. Cross appeal by plaintiffs in action number 7 from stated portions of the judgment dated November 18, 1982 and entered in that action, dismissed as abandoned (22 NYCRR 670.20 [f]).

Appellant is awarded one bill of costs payable by respondents and respondents-appellants appearing separately and filing separate briefs.