Matter of Hudson Val. Prop. Owners Assn. Inc. v City of Kingston (2025 NY Slip Op 03691)

Matter of Hudson Val. Prop. Owners Assn. Inc. v City of Kingston

2025 NY Slip Op 03691

Decided on June 18, 2025

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on June 18, 2025

No. 59 

[*1]In the Matter of Hudson Valley Property Owners Association Inc. et al., Appellants,
v
City of Kingston, et al., Respondents.

Magda L. Cruz, for appellants. 
Barbara J. Graves-Poller, for respondents City of Kingston et al.
Sarah L. Rosenbluth, for respondents Kingston New York Rent Guidelines Board et al.
Marcie Kobak, for respondents Citizen Action of New York, et al.
Building and Realty Institute of Westchester and Putnam Counties, Inc. et al., Small Property Owners of New York, New York State Conference of Mayors and Municipal Officials, The Real Estate Board of the State of New York et al., amici curiae.

HALLIGAN, J.

:
In 2019, the Legislature enacted the Housing Stability and Tenant Protection Act (HSTPA), which expanded the rent stabilization scheme originally effective only in the City of New York and Nassau, Westchester, and Rockland counties to all municipalities in the state (see L 2019, ch 36, § 1, part G, § 3; see also ETPA, McKinney's Uncons Laws of NY § 8621 et seq., L 1974, ch 576, § 4, as amended]). Under the ETPA, municipalities with an ongoing housing emergency may opt in to rent stabilization and create a rent guidelines board, which may in turn promulgate guidelines governing rental rates for covered units within the municipality (see e.g. ETPA §§ 3, 4 [Uncons Laws §§ 8623, 8624]).
The City of Kingston (the City) was one of the first municipalities in the state to exercise this newly granted authority. On August 1, 2022, it declared a housing emergency and opted in to the ETPA (see ETPA § 3 [a] [Uncons Laws § 8623 (a)]). Before us, petitioners, a group of private landlords and an association representing landlords in the Hudson Valley, seek to invalidate Kingston's ETPA opt-in and to invalidate two guidelines subsequently [*2]promulgated by the Kingston New York Rent Guidelines Board (KRGB). We reject petitioners' challenges and affirm.
I
To enter into the ETPA's rent-stabilization regime, a municipality's "local legislative body" must make "[a] declaration of emergency" as to all or any class of housing accommodations within the municipality. It may do so only if the vacancy rate for those housing accommodations "is not in excess of five percent" (ETPA § 3 [a] [Uncons Laws § 8623 (a)]). Once the municipality makes such a declaration, it must recommend members to be appointed to a newly formed rent guidelines board by the State Division of Housing and Community Renewal's (DHCR) commissioner (ETPA § 4 [Uncons Laws § 8624]).
After HSTPA's enactment in 2019, the City commissioned a survey from the Center for Governmental Research (CGR) to evaluate the vacancy rate for housing units in multifamily buildings with six or more residential units constructed prior to January 1, 1974—a definition that includes all housing units potentially subject to the ETPA (see ETPA § 5 [a] [Uncons Laws § 8625 (a)]). The 2019 survey used data from local governmental records to develop a list of residential properties that fell within the study's scope and sent a form to the owners of those properties by U.S. certified mail. CGR notified owners in the initial survey that it would apply a "no-vacancy" presumption if neither the certified mail survey nor the follow-up efforts yielded a response, and made various follow-up efforts if property owners did not respond to the initial survey. The CGR survey recorded units as "vacant" if they were unoccupied and available for rental at the time of the survey response. It reported a 5.8% vacancy rate across all surveyed properties, including surveyed but non-responsive properties where CGR had applied the no-vacancy presumption.
In 2022, following demographic changes related to the COVID pandemic and increasing concerns about housing affordability, Kingston's Director of Housing Initiatives conducted an updated study of the vacancy rate for the same class of rental units examined in 2019 (housing units in multifamily buildings constructed prior to 1974 with six or more units) (the 2022 survey). Buildings were included in the study based on data obtained from the City Assessor's office. As with the CGR survey, a form was sent via certified mail to building owners' mailing addresses, and the form noted that properties of non-responsive owners would be deemed to have zero vacant units. The Director followed up with properties that had the largest number of residential units to pursue responses or confirm data that had been submitted. A response was recorded from around 40% of all buildings included in the survey, which encompassed over 70% of included residential units. Taking into account the no-vacancy presumption for buildings where no response was received, the survey reported a vacancy rate of less than two percent.
On June 15, 2022, a committee of the City's Common Council discussed the survey with the Director in a public meeting, and thereafter held a public hearing as required by the ETPA (see ETPA § 3 [c] [Uncons Laws § 8623 (c)]). On July 28, 2022, the Common Council declared that the City's vacancy rate did not exceed five percent and, effective August 1, 2022, opted in to rent stabilization under the ETPA. The Common Council later passed a resolution requiring the City's Office of Housing Initiatives to conduct an updated vacancy study once every three years.
Petitioners filed this hybrid CPLR article 78 proceeding and declaratory judgment action seeking annulment of the declaration of a housing emergency and a judicial declaration that the City's vacancy rate exceeded five percent, based on a survey independently conducted by the property owners. They also sought an interim stay of the declaration of emergency, which Supreme Court denied.
Following a series of public meetings, the newly-created KRGB adopted two guidelines on November 9, 2022, pursuant to the ETPA. The first, a "fair market rent" guideline, provided that a tenant could seek a refund of rents paid in excess of the fair market rent between January 1, 2019, and July 31, 2022, by filing an appeal with DHCR. The guideline defined a unit's "fair market rent" as 116% of the rent charged for that unit on January 1, 2019 (see ETPA § 9 [Uncons Laws § 8629]). The second, a "rent adjustment" guideline, required that rent for one- and two-year leases commencing between August 1, 2022, and September 30, 2023, be reduced by 15% from the initial legal regulated rent (see ETPA § 6 [b] [Uncons Laws § 8626 (b)] [defining "initial legal regulated rent"]). Petitioners amended their petition to seek either annulment of both guidelines or a writ preventing the City from enforcing them.
Supreme Court upheld Kingston's emergency declaration, holding that "petitioners fail[ed] to demonstrate that [the City's] survey results were unreasonable" (2023 NY Slip Op 34640[U], *5 [Sup Ct, Ulster County 2023]). Although petitioners had submitted an independent survey which they claimed showed a vacancy rate above five percent, Supreme Court noted that the ETPA "charges local governments with the responsibility of conducting [*3]housing vacancy surveys," and "ultimately it is the reasonableness of the City's survey that is at issue" (id.). Supreme Court emphasized that the recorded responses covered over 70% of included residential units, and that the City's survey form "expressly stated" that in the event of a non-response, a building would be deemed to have no vacancies (id.). Because the survey "was conducted in good faith, used a proper methodology and was based on a [common-sense] analysis of available data," Supreme Court concluded that the survey was sufficient to support the City's housing emergency declaration (id.).
Supreme Court vacated both KRGB guidelines. Concerning the fair market rent guideline, Supreme Court held that the ETPA requires "a case[-]by[-]case determination as to the fair market rental value for each unit challenging its initial legal regulated rent," and that using January 1, 2019, as a benchmark date for the fair market rent calculation was impermissibly retroactive (id. at *7). Supreme Court also invalidated the rent adjustment guideline on the ground that the KRGB "lacked statutory authority to simply declare rent adjustments for all subject units based on fixed percentages" (id.).
The Appellate Division modified Supreme Court's order by reinstating the challenged KRGB guidelines, and otherwise affirmed (see 227 AD3d 1 [3d Dept 2024]). The Appellate Division observed that "the issuance of an emergency declaration under the ETPA is a discretionary matter for a municipality," and therefore "petitioners bore the burden of establishing that the Common Council's determination lacked a rational basis or was arbitrary and capricious," which they had failed to do (id. at 6 [internal quotation marks omitted]). Adopting language from a Second Department case, Executive Towers, the Appellate Division held that the emergency declaration was permissible because it was based on "a good faith study derived from precise data" (id. at 6-7 [internal quotation marks omitted], quoting Executive Towers at Lido, LLC v City of Long Beach, 37 AD3d 650, 652 [2d Dept 2007]).
The Appellate Division upheld the fair market rent guideline. It concluded that "the Board was not obliged to conduct a case-by-case assessment to specify a fair market rent guideline," especially because "[a] tenant or landlord may indeed apply to DHCR for a modification of initial legal regulated rent" upon a showing of unique or peculiar circumstances (227 AD3d at 9, citing ETPA § 9 [a] [Uncons Laws § 8629 (a)]). The Appellate Division also held that the fair market rent guideline did not have an impermissibly retroactive effect, as DHCR regulations prohibited the issuance of any refund "relat[ing] to a period more than two years prior to the local effective date" of August 1, 2022 (id. at 10-11, citing Emergency Tenant Protection Regs [9 NYCRR] § 2502.3 [a] [2], Matter of Freeport Randall Co. v Herman, 56 NY2d 832, 834 [1982], and Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 35 NY3d 332, 349-350 [2020]).
The Appellate Division upheld the rent adjustment guideline as well, reasoning that the ETPA empowers a rent guidelines board to "establish annual guidelines for rent adjustments," that it does not "explicitly require[ ] that the Board adjust the rent upward rather than downward," and that the KRGB was not obligated "to conduct a case-by-case assessment of rental units in setting the adjustment guideline" (227 AD3d at 9, citing ETPA § 4 [b] [Uncons Laws § 8624 (b)]).
The Appellate Division granted petitioners leave to appeal (2024 NY Slip Op 73143[U] [3d Dept 2024]).
II.
We first consider whether the lower courts properly upheld the Common Council's declaration of a housing emergency under the ETPA.
The ETPA states that "[t]he existence of [a] public emergency requiring the regulation of residential rents for all or any class or classes of housing accommodations, . . . shall be a matter for local determination within each city, town or village." It instructs that "[a]ny such determination shall be made by the local legislative body of such city, town or village on the basis of the supply of housing accommodations within such city, town or village, the condition of such accommodations and the need for regulating and controlling residential rents within such city, town or village" (ETPA § 3 [a] [Uncons Laws § 8623 (a)]). It further provides that a declaration may be made "if the vacancy rate for the housing accommodations in such class within such municipality is not in excess of five percent" (id.).
Although the ETPA requires that a proposed emergency declaration be considered at a public hearing (id. § 3 [c]), at the time the City issued its emergency declaration, it did not prescribe any method for determining a municipality's vacancy rate [FN1]. Nor does it offer any explicit guidance as to what quantum of evidence a local [*4]legislative body must consider before declaring a housing emergency. We considered an ETPA emergency declaration in Spring Val. Gardens Assoc. v Marrero, and rejected a presumption of validity because the vacancy rate finding itself is a precondition to a municipality's exercise of authority under the ETPA (68 NY2d 627, 629 [1986], affg 100 AD2d 93, 99 [2d Dept 1984]). We upheld the finding at issue in Spring Valley as "adequately made," but did not elaborate on the relevant inquiry for reviewing an emergency declaration.
When a plaintiff challenges an emergency declaration made pursuant to the ETPA, the key question is whether the vacancy rate finding rests a reasonably reliable and relevant measure of the municipality's actual vacancy rate for the relevant class of housing accommodations. The burden of demonstrating that a finding does not meet this standard rests on the plaintiff.
The support for a municipality's emergency declaration need not be unimpeachable, and it may be impossible for any set of data to perfectly capture the exact real-time vacancy rate of a class of housing accommodations (see e.g. Spring Valley, 100 AD2d at 98 [a municipality's emergency declaration "may not be made on less than reasonable grounds," but does not need to account for "information as to all of the buildings in the relevant classification"]). The mere fact that the data underlying an emergency declaration could be more thorough or comprehensive should not suffice, standing alone, to invalidate a declaration. On the other hand, if challenged, a municipality should be able to explain why a survey was reasonably likely to yield reliable and relevant results and should not ignore obvious flaws in survey design that would distort the results.
Here, the City demonstrated that the 2022 survey on which it based its emergency declaration met this test. The survey's methodology was reasonably likely to yield relevant and reliable data (see 227 AD3d at 7-8), and the data was properly recorded by the surveyor and presented to the Common Council. As the courts below noted, the list of included properties was drawn from governmental records; the survey adopted CGR's definition of a "vacant" unit; the survey used certified mail to ensure delivery of survey forms to owners' addresses; survey recipients were informed that a no-vacancy presumption would apply to non-responsive properties; the survey recorded responses covering a large majority of included apartment units; and the survey director conducted follow-up efforts to obtain accurate responses from the largest covered buildings (id. at 8-9 [the Director of Housing Initiatives "responded to petitioners' contentions in detail, however, describing how petitioners simply misunderstood the methodology behind the 2022 study in some respects"]).
Many of petitioners' complaints about the survey results reflect minor methodological disputes, not fundamental problems with the reliability or the relevance of the survey's data. For instance, petitioners take issue with how the no-vacancy presumption was applied, but they point only to several units in non-responsive buildings which they claim were improperly counted as not vacant, and do not successfully rebut the City's justification for applying the no-vacancy presumption to those units. Other contentions are essentially disagreements with the definition of "vacant." For example, petitioners argue that certain units which were unavailable for rent due to short-term renovations were erroneously counted as vacant (2023 NY Slip Op 34640[U], at *5 [discussing petitioners' objections to the records concerning certain buildings]). Petitioners criticize the survey's low response rate as measured by the percentage of buildings with recorded responses (about 40% of included buildings), but elide the fact that those buildings accounted for over 70% of the relevant housing accommodations (see 227 AD3d at 7-8). And although petitioners correctly note that the survey's follow-up efforts focused on large buildings, they offer no reason to think that this approach would significantly distort the measured vacancy rate.
Additionally, the City "responded to petitioners' contentions in detail," as the Appellate Division emphasized, and "describe[ed] how petitioners simply misunderstood the methodology behind the 2022 study in some respects" (id. at 8-9; cf. Executive Towers at Lido, 37 AD3d at 651-652, citing ETPA § 3 [b] [Uncons Laws § 8623 (b)]). These responses "[made] clear that, to the limited extent that petitioners pointed to actual errors in the study that required correction, the data collected still reflected that the net vacancy rate was lower than 5%" (id.). To give one example, the City acknowledged that one building was included in the survey results despite having been damaged by a fire and thus rendered unsuitable for housing. Petitioners did not establish, though, that the building was included due to an improper methodology that would be likely to produce unreliable or irrelevant results in the aggregate.
For the reasons given by the lower courts, we conclude that petitioners have thus failed to meet their burden of establishing that the City's vacancy rate finding does not rest on a reasonably reliable and relevant measure of the actual vacancy rate. Accordingly, we affirm the determination of the Appellate Division that petitioners are not entitled to a declaratory judgment or relief under article 78.
III.
We next turn to the two guidelines. Petitioners claim that the fair market rent guideline has an impermissibly retroactive effect, and relatedly, that using January 1, 2019, as a reference date for calculating the fair market rent is unlawful. Petitioners look to Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal (35 NY3d 332 [2020]) for support, arguing that the fair market rent guideline impermissibly punishes property owners for past conduct.
Neither Regina nor the ETPA require invalidation of the fair market rent guideline or prevent the City from using January 1, 2019 as the reference date for the guideline. In Regina, we examined part F of HSTPA, which sought to extend the statute of limitations for rent overcharge actions under the Rent Stabilization Law and alter the evidentiary framework applicable to those actions (35 NY3d at 352-354, 363-365). We held that applying these new evidentiary rules to overcharges that took place before HSTPA's effective date would "expand[ ] the scope of owner liability significantly" based on past conduct that had previously been "inoculated by . . . old law," and thereby "alter[ ] substantive rights in multiple ways" (id. at 366-368 [internal quotation marks omitted]). For those reasons, we concluded that the Due Process Clause of the United States Constitution barred application of part F to overcharges within the relevant time frame (id. at 368-371, 386).
The fair market rent guideline challenged here does not squarely implicate Regina. Although DHCR acknowledges that applying the guideline to rents charged before HSTPA's effective date might pose retroactivity concerns, the record includes no such refund. Indeed, DHCR's own regulations prohibit DCHR from issuing a refund order "relat[ing] to a period more than two years prior to the local effective date" of an emergency declaration. As applied here, that prevents the issuance of any refunds for rent paid prior to August 1, 2020 (9 NYCRR 2502.3 [a] [2]; see also id. § 2500.2 [q] [2], [3]).
Petitioners instead seek facial relief invalidating the guideline on the theory that it may lead to rent refunds for rents charged prior to the local effective date of Kingston's housing emergency. Regina does not prohibit that. Unlike in Regina, no provision of state or local law "inoculated" property owners from DHCR refund claims prior to Kingston's declaration of a housing emergency on August 1, 2022. To the contrary, once HSTPA became effective on June 14, 2019, state law explicitly provided that rental units in Kingston might eventually become subject to ETPA regulation [FN2]
. Our holding in Matter of Freeport Randall Co. v Herman (56 NY2d 832, 833-834 [1982]) confirms the importance of this distinction. There, we held that the ETPA's rent-stabilization scheme could be applied to leases entered into after the ETPA's effective date but before a housing emergency had been declared, reasoning that apartment owners had entered into leases "subject to the power of the state reserved by [the ETPA] to itself and to the municipalities . . . to determine the emergency need for controlling rents within its borders," including by means of rent refunds (id. at 833-834).
Petitioners also seek to annul the City's rent adjustment guideline requiring a 15% reduction in rent. They argue that the authority granted to a rent guidelines board under section 4 of the ETPA does not allow a rent reduction (see ETPA § 4 [b] [Uncons Laws § 8624 (b)]), and that in setting the adjustment guidelines, the KRGB did not properly consider certain factors set forth in section 4 (b). These challenges to the rent adjustment guideline are not preserved and are therefore not properly before us.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Order affirmed, with costs. Opinion by Judge Halligan. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro and Troutman concur.
Decided June 18, 2025

Footnotes

Footnote 1: In 2023, after the City declared its housing emergency, the Legislature amended the ETPA to expressly provide that, to calculate the vacancy rate, a municipality may request building owners to provide "the most recent records of rent rolls," and may impose fines for those who refuse to participate (ETPA § 3 [d], [e] [Uncons Laws § 8623 (d), (e)], added by L 2023, ch 698). The Legislature also specified that "[a] nonrespondent owner shall be deemed to have zero vacancies" (id. § 3 [f]).

Footnote 2:To the extent that DHCR's regulations and Kingston's fair market rent guideline could be read to permit a refund for rent charged after HSTPA's effective date under a lease commenced before that date, we need not consider the propriety of such a refund on this facial challenge. We note, however, that DHCR has stated to us that the fair market rent guideline is permissible as applied to "leases entered into on or after HSTPA's effective date."